PUBLISH

**August 26, 2014**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

LEGINA and TODD THOMAS,

        Plaintiffs - Appellants,

v.

MARY KAVEN, Ph.D.; JILL
STRAITS, Ph.D.; and ANILLA DEL
FABBRO, M.D., in their individual
capacities,

        Defendants - Appellees.

No. 13-2076

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 2-12-CV-00381-JCH-LAM)**

---

Laura Schauer Ives, ACLU of New Mexico (Maureen A. Sanders, Sanders &
Westbrook PA, Albuquerque, New Mexico, and Matthew Garcia, Garcia Ives
Nowara, Albuquerque, New Mexico, with her on the briefs), Albuquerque, New
Mexico, for Appellants.

Mark J. Riley (Courtenay L. Keller and Tiffany L. Sanchez with him on the brief)
Riley, Shane & Keller, P.A., Albuquerque, New Mexico, for Appellees.

---

Before **TYMKOVICH**, **EBEL**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Legina and Todd Thomas are parents of M.T., a twelve-year-old girl at the time of the events at issue in this case. The Thomases placed M.T. in the University of New Mexico Children's Psychiatric Center after she revealed suicidal tendencies during a police investigation of a potential sexual assault. Doctors diagnosed her as exhibiting several serious psychiatric problems and recommended a prescription of psychotropic drugs. The Thomases resisted the doctors' diagnoses and recommendations. M.T. was evaluated for several weeks until Mrs. Thomas decided to remove her from the hospital. Concerned about her safety, M.T.'s doctors and therapist placed M.T. on a medical hold and pursued an involuntary residential treatment petition in state court. But, after a seven-day hold, M.T. was released before the involuntary commitment proceedings began.

The Thomases claim the doctors and the hospital violated their constitutional right to direct M.T.'s medical care and their right to familial association. The Thomases allege that the defendants violated their right to familial association when they placed a medical hold on M.T. and when they filed the petition for involuntary residential treatment in state court. The defendants filed a motion to dismiss, asserting absolute and qualified immunity. The district court granted the motion on qualified immunity grounds, and the Thomases appealed.

We agree with the district court that the Thomases have not stated a claim for a violation of their right to direct M.T.'s medical care. But we hold that the

Thomases have stated a claim for a violation of the right to familial association for the defendants' placing a medical hold on M.T. and seeking an order for involuntary residential treatment in state court. The defendants cannot establish as a matter of law at this point in the proceedings that the relevant state interests outweighed the Thomases' interest in their right to familial association. Under this standard, some factual development is necessary before the court can determine whether the defendants' actions were justified and they are thus entitled to qualified immunity for this claim.

We therefore AFFIRM in part and REVERSE in part and remand for further proceedings.

# I. Background

The relevant events occurred over the course of several weeks during April and May 2010.[1] On April 12, 2010, the Thomases learned that M.T. may have had sexual contact with a friend's older brother in the preceding few days. The Thomases asked the Lea County Sheriff's Department to investigate. M.T. expressed to the investigating officer that she wanted to harm herself, and the officer became concerned she was suicidal. Another officer conducted a suicide prevention screen and found M.T. was at risk of hurting herself. M.T. was

---

[1] Because this case is on appeal from a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), we accept all well-pleaded factual allegations in the complaint as true. *See Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006). We present the facts as articulated in the complaint.

transported to a local hospital for an evaluation. There, hospital staff and a representative from the New Mexico Child, Youth, and Families Department (CYFD) became concerned that M.T. would harm herself if sent home. The Thomases allege a CYFD representative told Mrs. Thomas that, if she did not consent to transfer her daughter to a state facility for a mental health evaluation, CYFD would assume custody. The Thomases consented to the transfer and evaluation, and M.T. was taken to the University of New Mexico Children's Psychiatric Center in Albuquerque, five hours from the plaintiffs' home.

On April 13, M.T. was admitted to the psychiatric center. During intake, the plaintiffs explained that, although they were concerned about M.T.'s statements expressing suicidal thoughts, they were inclined to believe she was not truly suicidal and was only trying to divert attention from the incident with her friend's older brother. M.T. told doctors a changing story, first reporting she previously attempted suicide thirty times but then saying she had three attempted suicides. In contrast, the Thomases told doctors that they were unaware of any suicide attempts.

On April 14, M.T.'s treating psychiatrist, Anilla Del Fabbro, spoke with Mrs. Thomas by phone and explained she believed M.T. was suffering from depression and possible schizophrenia and was experiencing hallucinations. Del Fabbro recommended M.T. be placed on a specialized type of psychotropic treatment to treat her depression. Del Fabbro also opined that the treatment

-4-

would help with M.T.'s academic performance and behavioral issues in school. Mrs. Thomas replied that M.T. had no problems in school and had not experienced hallucinations before. She refused permission for the psychotropic regimen and expressed a desire to explore alternative treatments before the use of medication.

On April 16, Del Fabbro again telephoned Mrs. Thomas to request permission to treat M.T. and reported that M.T. confessed she had been suffering hallucinations for years. Mrs. Thomas refused, reiterating her position that M.T. was being dishonest with her physicians. She also stated she researched the proposed medical treatment on the Internet and was wary of its potential side effects. She faxed Del Fabbro several documents supporting her position that M.T. did not have behavioral problems in school. In light of the Thomases' refusal to allow psychotropic treatment, the defendants determined that M.T. should go to a residential treatment facility upon release from UNMCPC rather than back home. Plaintiffs initially agreed to consider such a plan.

On April 20, Dr. Mary Kaven conducted a psychological evaluation on M.T. Mrs. Thomas was unavailable to participate in person, and was told by Jill Straits, M.T.'s therapist at UNMCPC, that Mrs. Thomas could only receive the complete evaluation in person. Straits did reveal, however, that M.T. was diagnosed with major depressive disorder, borderline personality disorder, and early-onset schizophrenia. Straits further told Mrs. Thomas that doctors believed

-5-

M.T. had an intellectual disability, and, because M.T. had been diagnosed with petite mal seizures as a child, the combination of the mental disability, schizophrenia, and the seizures may combine to result in M.T. never returning to reality. Mrs. Thomas expressed skepticism and told Straits that M.T. was in the gifted program at school and she had not suffered a seizure since she was a toddler. The summation of the doctors' diagnoses caused Mrs. Thomas to lose faith in the doctors' assessments of M.T.

On April 26, Del Fabbro again called Mrs. Thomas seeking permission to treat M.T. with psychotropics, as well as anti-psychotic medication and melatonin supplements. Mrs. Thomas refused permission and asked for a fax of the psychological evaluation. Del Fabbro informed her the evaluation would only be provided in person.

On April 27, Straits contacted CYFD to express concern about plaintiffs' disregard of the doctors' recommendations and their refusal to allow administration of psychotropic drugs. The next day, Mrs. Thomas agreed to come to Albuquerque to meet with physicians, promising to listen to their recommendations with an open mind but expressing an inclination to sign M.T. out of the facility. Following this conversation, Straits again contacted CYFD and this time accused Mrs. Thomas of medical neglect for failing to follow the doctors' recommendations.

Two days later, Mrs. Thomas met with defendants to discuss M.T.'s evaluation. Kaven informed her that M.T.'s diagnosis was major depressive disorder with psychosis, borderline traits, and post-traumatic stress. She noted that plaintiffs' medical insurance was very good and would cover almost anything, which prompted defendants to put M.T. on a waitlist for a residential treatment facility without seeking her parents' authorization. Mrs. Thomas told defendants she did not believe M.T. was suicidal or experiencing hallucinations and again declined to consent to psychotropic medical treatment. Del Fabbro informed Mrs. Thomas the defendants did not believe she was competent to make medical decisions on her child's behalf. Fearing that Mrs. Thomas would remove M.T. from the hospital, on April 29, Del Fabbro placed M.T. on a medical hold so that Mrs. Thomas could not obtain her release that day.[2]

The next day, Del Fabbro reported the Thomases to CYFD for medical neglect for failure to consent to psychotropic treatment for M.T.'s psychosis. On May 4, the defendants' petition for involuntary residential treatment was filed in state court in order to confine M.T. at UNMCPC for a period not to exceed sixty

---

[2] The Thomases allege the defendants placed a five-day hold on M.T., but the record demonstrates that they placed a seven-day hold on her.

days.[3]  The hospital notified the Thomases that the hearing would take place in Bernalillo County Second Judicial District Court on May 10.

On May 5, Straits telephoned Mrs. Thomas to tell her to pick up her daughter immediately because the Thomases' insurance carrier would no longer cover the costs of M.T.'s hospitalization.  The defendants concluded there was an adequate safety plan in place to prevent imminent harm to M.T.  They discharged M.T. on May 6 and abandoned the involuntary commitment petition.  On May 7, despite the discharge, Kaven again reported the plaintiffs to CYFD for medical neglect for not believing the diagnoses and refusing to allow administration of psychotropic drugs.  Nothing came of the report, and M.T. returned to school and experienced no further problems arising from the incident.

The Thomases sued under 42 U.S.C. § 1983, claiming the defendants violated their Fourteenth Amendment right to direct their child's medical care and the right to familial association.[4]  The defendants asserted defenses of absolute and qualified immunity and filed a motion to dismiss.  The district court granted the motion to dismiss, holding the defendants were entitled to qualified immunity.

---

[3]  Although Straits was the only person designated as the state court petitioner, the complaint states that all three defendants were involved in the decision to abandon the petition.  We will construe the complaint to allege that all three defendants were involved in the decision to file the petition.

[4]  The plaintiffs also brought a First Amendment associational claim, which the district court dismissed without objection.

The court concluded that the complaint did not state a claim for violations of clearly established rights to direct medical care and to familial association.

## II. Analysis

The Thomases argue the district court erred in granting the defendants' motion to dismiss. At this stage in the case, they contend the complaint alleges sufficient facts to sustain their claims that the defendants knowingly deprived the Thomases of their clearly established rights to direct M.T.'s medical care and to familial association.

We review a Rule 12(b)(6) dismissal de novo. *Cressman v. Thompson*, 719 F.3d 1139, 1144 (10th Cir. 2013). "At the motion-to-dismiss stage, we must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Id.* at 1152. To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

### A. Absolute Immunity

The defendants first argue they are entitled to absolute immunity for initiating a medical hold on M.T. and filing a petition for involuntary residential

treatment in state court.[5]  The defendants argue that, because their actions were

"intimately associated" with the judicial process, they are entitled to absolute

immunity.  *Scott v. Hern*, 216 F.3d 897, 909 (10th Cir. 2000).

Absolute immunity offers certain government officials total protection from

a suit for damages under 42 U.S.C. § 1983.  *Mink v. Suthers*, 482 F.3d 1244, 1258

(10th Cir. 2007).  Prosecutors are "absolutely immune for those activities

'intimately associated with the judicial phase of the criminal process.'"  *Id.* at

1259 (quoting *Imbler v. Pacthman*, 424 U.S. 409, 430 (1976)).  But the Supreme

Court has made clear that absolute immunity is not available for "those aspects of

the prosecutor's responsibility that cast him in the role of an administrator or

investigative officer rather than that of advocate."  *Imbler*, 424 U.S. at 430–31.

In limited circumstances, absolute immunity is also available to other

government officials "who perform functions closely associated with the judicial

process."  *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985); *see also Butz v.

Economou*, 438 U.S. 478, 515 (1978) ("We also believe that agency officials

performing certain functions analogous to those of a prosecutor should be able to

claim absolute immunity with respect to such acts.").  Officials who "seek

---

[5]  The Thomases argue that, because the district court held defendants were entitled to qualified immunity, the defendants must file a cross-appeal to seek absolute immunity.  But because the defendants are asking this court to affirm the grant of immunity on an alternate basis without enlarging the scope of its own rights—*i.e.*, immunity from suit—the defendants need not file a cross-appeal.  *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1271 n.33 (10th Cir. 2011).

exemption from personal liability" on the basis of absolute immunity bear "the burden of showing that such an exemption is justified by overriding considerations of public policy." *Forrester v. White*, 484 U.S. 219, 224 (1988).

"In determining whether particular acts of government officials are eligible for absolute immunity, we apply a 'functional approach . . . which looks to the nature of the function performed, not the identity of the actor who performed it.'" *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1314 (10th Cir. 1999) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). "The more distant a function is from the judicial process, the less likely absolute immunity will attach." *Snell v. Tunnell*, 920 F.2d 673, 687 (10th Cir. 1990). We have recognized, for example, that social workers may be entitled to absolute immunity in limited circumstances. *See id.* ("The courts have looked to the particular task a defendant was performing and its nexus to the judicial process rather than deciding that social workers or guardians ad litem as a class are entitled to absolute immunity."). In this circuit, aspects of civil commitment proceedings can provide government officials the basis for absolute immunity. *See Hern*, 216 F.3d at 909.[6]

_____

[6] The Supreme Court has not addressed the question of whether social workers can gain absolute immunity from suit for actions functionally analogous to a prosecutor's duties. But at least one Justice has noted potential problems with making absolute immunity available to social workers. *See Hoffman v. Harris*, 511 U.S. 1060 (1994) (Thomas, J., dissenting from denial of petition for writ of certiorari) ("The courts that have accorded absolute immunity to social

(continued...)

-11-

The same limitations that apply to granting absolute immunity to prosecutors also apply to other government officials. In *Snell*, we held that the crucial distinction for determining whether a social worker was entitled to absolute immunity was whether the social worker was acting in a way functionally analogous to a prosecutor or in an investigative capacity. *Id.* at 689. Because the social workers in that case sought a custody order as part of their investigation into child abuse and before any petition was filed to adjudicate the status of the child, the social workers were acting in an investigative capacity. *Id.* at 690. In concluding the social workers could claim only qualified immunity, we held that "[a] social worker seeking a pre-petition order for protective custody functions like a police officer seeking an arrest warrant; a functional approach to immunity requires that those performing like functions receive like immunity." *Id.*[7]

---

[6](...continued)
workers appear to have overlooked the necessary historical inquiry; none has seriously considered whether social workers enjoyed absolute immunity for their official duties in 1871. If they did not, absolute immunity is unavailable to social workers under § 1983."); *see also* Margaret Z. Johns, *A Black Robe Is Not A Big Tent: The Improper Expansion of Absolute Judicial Immunity to Non-Judges in Civil-Rights Cases*, 59 SMU L. Rev. 265, 285–90 (2006).

[7] Other circuits agree that absolute immunity does not protect social workers acting in an investigative capacity, but that it does protect social workers acting in a prosecutorial capacity—such as when initiating child custody proceedings in court. *See, e.g.*, *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) ("[S]ocial workers are absolutely immune only when they are acting in their capacity as legal advocates—initiating court actions or testifying under

(continued...)

-12-

The Thomases urge us to find that the defendants' roles in seeking involuntary commitment were not akin to the role of a prosecutor. They argue, rather, that filing an involuntary residential treatment petition is more akin to the role of a complaining witness. The Supreme Court has held that a complaining witness, as opposed to an official acting in a prosecutorial capacity, is not entitled to absolute immunity. *See Rehberg v. Paulk*, 132 S. Ct. 1497, 1507 (2012) (explaining that a complaining witness "refer[s] to a party who procured an arrest and initiated a criminal prosecution"); *Kalina v. Fletcher*, 522 U.S. 118, 130 (1997) (denying absolute immunity to prosecutor who stepped into role of fact witness when she attested to the truth of facts supporting a warrant); *Wyatt v. Cole*, 504 U.S. 158, 164–165 (1992) (a complaining witness "set[s] the wheels of government in motion by instigating a legal action"). The relevant distinction for absolute immunity purposes is whether the official's actions are prosecutorial or testimonial; is the prosecutor acting as an advocate for the state or as fact witness? *See Kalina*, 522 U.S. at 129–30.

We need not fully decide this difficult question in this case. The injury alleged by the Thomases derived solely from the defendants' decision to place

[7](...continued)
oath—not when they are performing administrative, investigative, or other functions."); *Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.*, 812 F.2d 1154, 1157 (9th Cir. 1987) ("[S]ocial workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings.").

M.T. on a seven-day emergency medical hold. Of course, the defendants were then statutorily required to obtain a court order to continue involuntary residential treatment. *See* N.M. Stat. § 32A-6A-20(J). But M.T. was discharged before any court proceedings began. Although the petition was pending for part of the time the medical hold was in effect (the petition was filed five days later), no causal connection exists between the commencement of judicial proceedings and the Thomases' injury. The infringement on the Thomases' right to familial association stemmed solely from the emergency medical hold the defendants placed on M.T prior to the filing of the petition.

Even if we were to find a causal connection between the filing of the petition and the injury, we doubt the defendants would be entitled to absolute immunity for their decision to seek a judicial order. According to the New Mexico Children's Code, if the child's physician or psychologist believes a guardian's attempt to discharge his or her child goes against the child's best interests, the physician or psychologist can "request that the *children's court attorney* initiate involuntary residential treatment proceedings." N.M. Stat. § 32A-6A-20(J) (emphasis added). After the request, the children's court attorney "may petition the court for such proceedings." *Id.* Under this division of labor, the children's court attorney has the sole discretion to initiate involuntary commitment proceedings. The role of the physician or psychologist under this scheme is more akin to the role of the complaining witness who "set[s] the wheels

-14-

of government in motion by instigating a legal action." *Wyatt*, 504 U.S. at 164–165.

Extending absolute immunity to government employees who are not statutorily authorized to petition the court directly would be an unwarranted expansion of absolute immunity protection. "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486–87 (1991); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (explaining that one of the purposes of qualified immunity is "to shield officials from harassment, distraction, and liability when they perform their duties reasonably"). Absolute immunity extends only so far as is necessary to protect the judicial process. *Burns*, 500 U.S. at 492 (explaining that absolute immunity applies to prosecutors because the "substantial likelihood of vexatious litigation . . . might have an untoward effect on the independence of the prosecutor"). Extending absolute immunity to those who solicit a government attorney to initiate judicial proceedings is unnecessary to protect the judicial process. *See Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010) (extending absolute immunity only to child protection agency attorney despite agency officials directing the attorney to initiate court proceedings).

The defendants' decision to place an emergency medical hold on M.T. in anticipation of Mrs. Thomas's attempt to discharge M.T. is not protected by

absolute immunity. The decision to place the hold was not closely associated with the judicial process. An emergency medical hold is a mechanism for facilities to temporarily prevent a patient's discharge when personnel believe the patient's medical circumstances warrant such a measure. Medical personnel are not required to obtain judicial permission before placing a temporary hold on a patient's discharge. In this case, the medical hold preceded the filing of an involuntary residential treatment petition and was functionally analogous to law enforcement officials taking unilateral emergency action. *See Snell*, 920 F.2d at 690 (declining to extend absolute immunity for social workers' efforts to gain protective custody before filing a petition in court); *Spielman v. Hildebrand*, 873 F.2d 1377, 1383 (10th Cir. 1989) (holding that defendants are not entitled to absolute immunity because they "acted unilaterally prior to the operation of the judicial process" (internal quotation marks omitted)).

In sum, the defendants are not entitled to absolute immunity for their decision to place M.T. on a medical hold. We thus turn to whether qualified immunity is available for the defendants' conduct.

## B. *Qualified Immunity*

Qualified immunity protects officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the qualified immunity defense is

-16-

asserted, the plaintiff "bears a heavy two-part burden" to show, first, "the defendant's actions violated a constitutional or statutory right," and, second, that the right was "clearly established at the time of the conduct at issue." *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008) (internal quotation marks omitted).

A right is clearly established in this circuit "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196–97 (10th Cir. 2010) (internal quotation marks omitted). A previous decision need not be "materially factually similar or identical to the present case; instead, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 1197 (internal quotations marks and alterations omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity. "Asserting a qualified immunity defense via a Rule 12(b)(6) motion, however, subjects the defendant to a more challenging standard

-17-

of review than would apply on summary judgment." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004); *see also Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) ("At [the motion to dismiss] stage, it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'  On summary judgment, however, the plaintiff can no longer rest on the pleadings, and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the [qualified immunity] inquiry." (citations omitted) (emphasis in original)).

### 1.  Right to Direct Child's Medical Care

The Thomases first allege in their complaint that the defendants violated their right to direct M.T.'s medical care when the defendants notified CYFD of potential parental medical neglect.

The Fourteenth Amendment protects the right of parents to make decisions "concerning the care, custody, and control of their children."  *Troxel v. Granville*, 530 U.S. 57, 66 (2000).  This right provides "some level of protection for parents' decisions regarding their children's medical care."  *Jensen*, 603 F.3d at 1197. Although neither the Supreme Court nor the Tenth Circuit has defined the precise scope of the right to direct a child's medical care, it is not absolute.  "[W]hen a child's life or health is endangered by her parents' decisions, in some circumstances a state may intervene without violating the parents' constitutional rights."  *Id.* at 1198.

Our decision in *Jensen* is illustrative. In that case, we concluded the medical defendants were entitled to qualified immunity because the parents' right to direct their child's medical care under the circumstances was not clearly established. Seven doctors had diagnosed the minor child with life-threatening cancer and recommended immediate chemotherapy treatment to save his life. A state-employed doctor and two social services officials pursued the treatment over the objections of the parents. We concluded that it was not clearly established that the Jensens had a right to refuse the recommendations of seven doctors or to shop around for additional opinions until they found a recommendation against conventional treatment. Because the Jensens had not asserted any factual allegation that would demonstrate state action clearly outside the state's "wide range of power" to protect children, the Jensens' right to direct their child's medical care under those circumstances was not clearly established. *Id.*

The Thomases frame their claim as the right to be free from an *allegation* of neglect by treating physicians. But none of our cases clearly establish that an allegation alone can be the basis for an infringement on the right to direct a child's medical care. In this case, the defendants' communications to CYFD resulted in no official action that affected the Thomases' right to direct M.T.'s medical care. We see no interference with M.T.'s medical treatment as a result of this communication, nor can the Thomases point to any case law that defines the contours of the right to direct medical care such that it would be "sufficiently

clear" to the defendants that reporting the plaintiffs to CYFD would violate that right. And the Thomases do not allege that any other conduct by the defendants violated their right to direct medical care.

Because the Thomases have not shown a violation of a clearly established right to direct M.T.'s medical care under these circumstances, the district court was correct to dismiss this claim.

### 2. *Right to Familial Association*

The Thomases also claim that the defendants violated their right to familial association when they placed M.T. on a temporary medical hold and sought an involuntary residential treatment order in state court. As we explained above, the decision to seek involuntary residential treatment was not the cause of the Thomases' alleged injury. The placement of the medical hold on M.T. to prevent her discharge was the cause of the alleged injury. We will therefore assess whether the Thomases have stated a claim for a violation of the right to familial association only with respect to the placement of the medical hold.

The government's "forced separation of parent from child, even for a short time, represents a serious impingement" on a parent's right to familial association. *Jensen*, 603 F.3d at 1199. But a parent must allege "intent to interfere" with this right—that is, the defendant must have directed conduct at the familial relationship "with knowledge that the statements or conduct will adversely affect that relationship." *Lowery v. Cnty. of Riley*, 522 F.3d 1086,

1092–93 (10th Cir. 2008). A familial association claim is grounded in "substantive due process" arising from allegations of abusive government authority. *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993); *see also Jensen*, 603 F.3d at 1198–99; *J.B. v. Wash. Cnty.*, 127 F.3d 919, 927 (10th Cir. 1997). Regardless of the intensity of a familial association claim, our cases establish that the right is not absolute, but must be weighed against the state's interest in protecting a child's health and safety in order to determine whether state actors unduly burdened that right in a given case. *See Youngberg v. Romeo*, 457 U.S. 307, 320–21 (1982); *see also Jensen*, 603 F.3d at 1199; *Lowery*, 522 F.3d at 1092.[8] To state a claim for the deprivation of the right of familial association, the Thomases had to allege that (1) defendants intended to deprive them of their protected relationship with their daughter, *see Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1175 (10th Cir. 2013), and that (2) balancing the Thomases interest in their protected relationship with M.T. against the state's interests in M.T.'s health and safety, defendants either unduly burdened plaintiffs' protected relationship, *see Jensen*, 603 F.3d at 1199, or effected an "unwarranted intrusion" into that relationship, *Trujillo v. Bd. of Cnty. Comm'rs*, 768 F.2d 1186, 1189 (10th Cir. 1985). In conducting this balancing, the court will consider, among other things, the severity of the infringement on the

[8] The Thomases also point to "procedural due process" cases to support their claim. They did not assert this theory in the district court, and we decline to address it. *See Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012).

-21-

protected relationship, the need for defendants' conduct, and possible alternative courses of action. *See Griffin*, 983 F.2d at 1548.

The facts alleged in the complaint here are sufficient to state a claim for deprivation of the right to familial association. When Mrs. Thomas indicated she was inclined to have M.T. discharged from the hospital on April 29, Del Fabbro placed a medical hold on M.T. The purpose and effect of this action was to prevent Mrs. Thomas from removing M.T. from the hospital. The complaint sufficiently alleges that all defendants were involved in the decision to retain custody of M.T. at this time.

Upon the defendants' assertion of the defense of qualified immunity, the Thomases were required to state a claim of not only a violation of a constitutional right, but a violation of a clearly established right. *Iqbal*, 556 U.S. at 673. The defendants argue that they are entitled to qualified immunity because the Thomases failed to show an immediate threat to M.T.'s life *did not* exist.

The scope of the right to familial association, at least in the context of deprivation of parental custody in certain circumstances, is clearly established. But at this stage in the proceedings, we do not have the information necessary to determine whether a state interest in M.T.'s health and welfare existed such that it would have been justified for the defendants to infringe upon the Thomases' right to familial association. Whether the right to familial association has been violated requires the court to conduct a fact-intensive balancing test not ordinarily

suitable for the Rule 12(b)(6) stage.  When the facts have not yet been fully brought out through discovery, it is difficult for the court to adequately conduct the relevant constitutional test.  *See Devlin v. Kalm*, 531 F. App'x 697, 707 (6th Cir. 2013) ("[W]hile officers will often be entitled to qualified immunity under [a multi-factor balancing test], this will only be evident after an opportunity for discovery so that the court can know what is being balanced against what.").  While we can consider the objective reasonableness of defendants' actions at the motion to dismiss stage, we can only scrutinize their conduct "*as alleged in the complaint*."  *Behrens*, 516 U.S. at 309.  A complaint might sometimes contain sufficiently detailed facts to allow for a qualified immunity inquiry, but such is not the case here.

The facts alleged in the Thomases' complaint, when accepted as true and viewed in a light favorable to the plaintiffs, do not show an immediate threat of suicide had M.T. been discharged.  The complaint does allege that suicidal ideation was a basis for M.T.'s intake, diagnosis, and course of treatment.  But the complaint does not contain facts showing M.T.'s suicide risk on April 29, the day the defendants instituted the medical hold and allegedly violated the plaintiffs' constitutional rights.  Although the complaint avers that M.T. expressed suicidal ideation on May 4, the complaint does not provide sufficient information or context for determining the immediacy or seriousness of the suicide threat during the course of the seven-day hold.  Moreover, the complaint

alleges the defendants chose to discharge M.T. because they determined her insurance would not cover the involuntary commitment, and not because her medical condition improved. Thus, to be able to adequately determine whether officials of reasonable competence could disagree as to the danger of discharging M.T., the court must allow for some factual development of the record.[9] The defendants will be entitled to qualified immunity if reasonable officers could at least disagree as to the danger of discharging M.T.

The defendants ask us to consider M.T.'s medical records to determine whether a reasonable official would have found an exigent situation existed. A district court may consider documents (1) referenced in a complaint that are (2) central to a plaintiff's claims, and (3) indisputably authentic when resolving a motion to dismiss without converting the motion to one for summary judgment. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384–85 (10th Cir. 1997). But there are reasons not to do so here. First, and most importantly, the medical records were before the district court under seal on a motion to appoint a *guardian ad litem*; the court did not consider them in the context of the motion to dismiss. Moreover, the record contains only isolated snippets of the

---

[9] Qualified immunity protects officers from the burdens of pre-trial discovery. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004). But if the district court determines that it cannot rule on the immunity defense without clarification of the facts, "it may issue a discovery order narrowly tailored to uncover only those facts needed to rule on the immunity claim." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (internal quotation marks omitted).

medical records—which appear as exhibits supporting the defendants' motion to appoint a *guardian ad litem*—and do not allow for a comprehensive review of the evidence. While the medical records will surely be central to the case at summary judgment, they are not the kind of documents we have ordinarily allowed to be entertained at the motion to dismiss stage.

In sum, the district court erred in granting the defendants' motion to dismiss on the right to familial association claim, insofar as it is based on the April 29 decision to place a medical hold on M.T. The Thomases have pleaded facts that demonstrate a violation of clearly established law. And, at this stage of the proceedings, there are insufficient undisputed facts to determine whether reasonable officers would disagree as to whether an immediate threat to M.T.'s life existed.

## III. Conclusion

We AFFIRM the dismissal of the plaintiffs' right to direct medical care claim. We REVERSE the dismissal of the plaintiffs' familial association claim. We remand for further proceedings consistent with this opinion.