FILED
United States Court of Appeals
Tenth Circuit

**February 9, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

KUSMIN L. AMARSINGH,

Plaintiff - Appellant,

v.

FRONTIER AIRLINES, INC.,

Defendant - Appellee.

No. 24-1391
(D.C. No. 1:23-CV-01875-GPG-KAS)
(D. Colo.)

_____

## ORDER AND JUDGMENT[*]

_____

Before **HARTZ**, **MORITZ**, and **ROSSMAN**, Circuit Judges.

_____

Kusmin L. Amarsingh, an attorney representing herself, appeals the district court's Fed. R. Civ. P. 12(b)(6) dismissal of her claims of racial discrimination and breach of contract. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. We also impose sanctions on Amarsingh for her misuse of generative artificial intelligence in researching and drafting her appellate brief.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.  BACKGROUND

Because we are reviewing the district court's grant of a motion to dismiss, we assume the truth of the factual allegations in the last in a series of amended complaints Amarsingh filed.  *See Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994) ("[A] Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true").

Amarsingh is "clearly of Indian descent."  R. vol. 1 at 67, ¶ 19.  She had a ticket for a flight on Frontier Airlines from Philadelphia to St. Louis, connecting through Orlando.  But she did not have an assigned seat.  She checked in online, arrived at the gate well in advance of departure, and waited to board.  Three Frontier agents were at the gate, all of whom were, or appeared to Amarsingh to be, African American.  An agent announced that the flight was overbooked by about 10 passengers and sought volunteers to change their flight for compensation.  No one volunteered.  In addition to Amarsingh, others awaiting a seat assignment included an African American family of 8 to 10 people, most of whom did not have seat assignments; five or six people who "were or appeared to be Hispanic"; a "male passenger, who was or appeared to be White"; "a gentleman who was or appeared to [be] part of [sic] African American"; an "Asian woman traveling with a child, accompanied by a white female"; and another woman "of Indian descent." *Id.* at 63–64, ¶¶ 5, 6, 9.

After all passengers with assigned seats had boarded, a "Frontier agent asked the party of three, with the child passenger, if one of the adults would give up their

2

seat. The child and the adult Asian female passenger were given seats and allowed to board." *Id.* at 63, ¶ 7. An agent then boarded the African American party of 8 to 10 people.[1] Amarsingh approached the counter to ask about a seat assignment and to try to "impress upon the agents that [her] flight was a connecting flight, and that there were no other alternative/feasible flights for [her] schedule for at least a week." *Id.* at 64, ¶ 8. But "[r]ather than permit [her] to speak," one of the agents kept interrupting, repeatedly telling Amarsingh "in a loud voice" to "have a seat" or "I can hear you," and staring at her "in a rude and very unprofessional manner." *Id.* (internal quotation marks omitted). At "one point" in the boarding process, the lead agent called her and the other Indian woman back to the counter and "wrote something on the passenger log and asked [them] to take a seat." *Id.* at 67, ¶ 19.

As Amarsingh and the others waited for a seat assignment, the plane departed, but the agents did not update the flight status on the monitors for 30 minutes. All the passengers then made their way to the counter, where the agents "became irate and told everyone to sit down in a very loud voice." *Id.* at 64, ¶ 10. The other Indian woman approached the counter, where "the lead agent began yelling at her in what sounded like a mocking Indian accent and while pointing to each passenger in front

---

[1]Amarsingh's brief on appeal complains that there was no need to seat all of the African-American group at that time because there was another flight 30 minutes later. But if there was such a flight, it would also have accommodated Amarsingh, unless she had a remarkably tight connection in Orlando. In fact, we note that documents she submitted in district court show that she was scheduled to have a layover of two hours and 21 minutes in Orlando. In any event, two pages later in her brief she acknowledges that she only "thought" there would be such a flight in 30 minutes. Aplt. Br. at 9.

of him asked her do you think you are more important than her, him, her[?]" *Id.* at 65, ¶ 10.

Eventually, the lead agent announced that everyone would receive a refund and $400 in compensation. But when Amarsingh went to the other two agents to get her refund and the compensation, "they only offered to refund . . . or rebook [her] flight." *Id.*, ¶ 12. At Amarsingh's request the lead agent clarified that all the passengers would receive both a refund and compensation. The lead agent then left. Amarsingh waited at the gate for an hour before returning to the counter, where an agent told her that the lead agent would not be returning and that she would "receive an email with [her] refund information." *Id.* at 66, ¶ 15.

Amarsingh left the airport and booked a flight to Florida (where she lives) the next day on another airline. As a result, she "lost approximately $1000.00 in flights" and "more importantly . . . the opportunity to attend [her] grandson's . . . birth announcement and family reunion" in St. Louis. *Id.*, ¶ 16. Despite filing two complaints with Frontier, Amarsingh has not "received any money or compensation of any kind from Frontier." *Id.*, ¶ 17.

Amarsingh then filed the action underlying this appeal. In the operative complaint she asserted two claims: (1) breach of contract and the covenant of good faith and fair dealing for failing to board her or issue a refund; and (2) racial discrimination in violation of 42 U.S.C. § 1981 based on allegations that Frontier discriminated against her because "she was not or [did not] appear[] to be African American." *Id.* at 67, ¶ 19. She sought $15 million in damages.

4

Frontier filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). A magistrate judge recommended granting the motion.

Over Amarsingh's timely objections the district court adopted the recommendation and dismissed the claims without prejudice. The district court dismissed the § 1981 claim because Amarsingh had not plausibly alleged that race was the but-for reason she was not boarded. The court explained that although an inference of racial discrimination could be drawn from the agent's mocking of the other Indian woman's accent, there were fatal flaws in Amarsingh's theory that she was not boarded because she was not African American: (1) some of those in the group of African Americans that were allowed to board already had assigned seats, and Amarsingh acknowledged that the severity of hardship is a race-neutral reason for a boarding decision; and (2) "agents also boarded two passengers that were not African American—the Asian woman and child," instead of the other African American man. R. vol. 3 at 107. The court also reasoned that these efforts to keep "groups together to the extent possible," which were "legitimate permissible criteria," undermined "Amarsingh's assertion that race was the deciding factor." *Id.* at 108.

The district court also considered Amarsingh's argument that the agents should have allowed her to board because the African American group could have taken a later flight that day but she would have had to wait at least another week for a Frontier flight through to St. Louis. But the court explained that any failure to consider the relative hardships did not mean the agents used race as the deciding

factor, particularly given that "[m]ost importantly," the "agents bumped an African American passenger." *Id.*

Turning to the breach-of-contract claim, the district court found that it did not pose a federal question and Amarsingh had not adequately alleged that there was a sufficient amount in controversy for diversity jurisdiction, because damages for emotional distress cannot be awarded absent allegations of willful or wanton breach and the amount in controversy could not include damages to nonparty passengers. Accordingly, having dismissed the sole federal claim, the court declined to exercise supplemental jurisdiction over the contract claim and dismissed it.

## II.  MERITS DISCUSSION

### A.    Standard of review

"We review a Rule 12(b)(6) dismissal de novo." *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014).  We "accept all the well-pleaded allegations of the complaint as true and . . . construe them in the light most favorable to the plaintiff." *Id.* (internal quotation marks omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

The court recognizes that Amarsingh is pro se.  Typically, "a pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Garrett v. Selby, Connor, Maddux, & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (brackets and internal quotation marks omitted).

But in the district court Amarsingh stated that she is "an attorney licensed in the State of Maryland." R. vol. 1 at 6. And in her appellate brief, she states that she "is an attorney," albeit "with no experience in federal district court." Aplt. Br. at 1 n.1.

In addition, we take judicial notice of the Maryland courts' publicly available records showing that Amarsingh is admitted to the bar in the State of Maryland and is listed as being in active status, which means she is "considered in good standing" and "authorized to practice law." Maryland Courts, Maryland Attorney Listing, https://www.mdcourts.gov/attysearch [https://perma.cc/A8SX-YYE3]. *See* Fed. R. Evid. 201(b)(2) (allowing courts to judicially notice facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). We therefore decline to extend Amarsingh the leeway afforded nonlawyers representing themselves. *See Mann v. Boatright*, 477 F.3d 1140, 1148 n.4 (10th Cir. 2007).

## B.    Analysis

"Section 1981 prohibits racial discrimination in 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1532 (10th Cir. 1995) (footnote omitted) (quoting 42 U.S.C. § 1981(b)). To survive a motion to dismiss, a plaintiff need not "establish a prima facie case in her complaint," but "the elements of each alleged cause of action help to determine whether [a] [p]laintiff has set forth a plausible claim." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

A prima facie § 1981 claim requires a showing that (1) "the plaintiff is a member of a protected class," (2) "the defendant had the intent to discriminate on the basis of race," and (3) "the discrimination interfered with a protected activity as defined in § 1981." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1102 (10th Cir. 2001). The second element—dispositive here—requires a plaintiff to show that the defendant "intentionally or purposefully discriminated against her." *Reynolds*, 69 F.3d at 1532. And to avoid dismissal under Rule 12(b)(6), a § 1981 plaintiff must allege facts plausibly stating a claim that the alleged discrimination was the but-for cause of the alleged interference with a protected activity. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 341 (2020) (holding that a § 1981 "plaintiff must *initially plead* and ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right" (emphasis added)).

Having reviewed the district court's ruling in light of the controlling law, we agree that Amarsingh did not plausibly allege a § 1981 claim. In particular, her allegation that the agents boarded the Asian woman and the child instead of the single African American man,[2] coupled with the reasonable inference from her allegations that the agents tried to keep parties together, fatally undermines her theory that the agents did not board her because she was not African American.

---

[2] The complaint obscurely refers to the man as "a gentleman who was or appeared to [be] part of [sic] African American." R. vol. I at 63. But she has not challenged the district court's reference to him as an African-American.

Amarsingh's arguments do not persuade us otherwise.[3]  Much of what she says concerns the district court.  But our review is de novo, so flaws in that court's reasoning are irrelevant.  Nevertheless, we will address each of the arguments as they purport to undermine the propriety of the dismissal.

One, Amarsingh contends that Frontier has a pattern or history of hostility that amounts to discriminatory treatment.  But she points to no specific episodes, relying on general complaints in the news and online.  And even her characterizations of these complaints do not support a claim of relevant racial discrimination.  If anything, they suggest that the airline treats everyone poorly, which would undermine her claim that the poor treatment she received was because of race.

Two, Amarsingh alleges that the district court "disregarded essential evidence," Aplt. Br. at 15, and categorized "flight schedules, boarding passes, and related documentation" as "extrinsic," *id.* at 17.  She further contends that "[m]ost facts were not addressed at all."  *Id.* at 25–26.  But Amarsingh does not identify what evidence the district court disregarded or what material facts it failed to address, and we are unable to locate where the court categorized any evidence as "extrinsic."

---

[3] Amarsingh says that her "arguments apply to both claims with separate conclusions to the claims."  Aplt. Br. at 11, n.5.  But the district court dismissed the contract claim by declining to exercise supplemental jurisdiction over it, and none of Amarsingh's arguments challenge that ruling.  She has therefore waived our review of that dismissal.  *See Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("Issues not raised in the opening brief are deemed abandoned or waived." (internal quotation marks omitted)).

Three, Amarsingh argues that the district court "refus[ed] to draw inferences of racial discrimination from the established facts, contrary to the principles articulated in *McDonnell Douglas Corp. v. Green*," 411 U.S. 792 (1973). Aplt. Br. at 17. She particularly faults the district court for not considering her contention that the lead "agent called her to the counter specifically to confirm her race," *id.* at 18, in light of Frontier's failure to offer "a substantive rationale" for the agent's conduct, *id.* at 19. But, as noted above, the complaint alleged only that the lead agent called her and the other Indian woman back to the counter and "wrote *something* on the passenger log and asked [them] to take a seat." R. vol. 1 at 67, ¶ 19 (emphasis added). Neither *McDonnell Douglas* nor any other precedent suggests that the court was required to make the speculative leap that the agent's purpose was somehow to "confirm[] that she was not African American." *Id*. at 110, ¶ 2.

Four, Amarsingh claims that the district court "did not inquire if [she] would have been seated . . . if she were African American." Aplt. Br. at 20. We disagree. The district court determined that the fact that the single African American man was bumped from the flight was "fatal" to her "argument that, if she were African American, she would have been allowed to board." R. vol. 3 at 107.

Five, Amarsingh contends that the district court determined that she did not convey the urgency of her need to board the flight until after the flight had departed. She is incorrect. The district court did not make that error. *See id.* at 108 (acknowledging that Amarsingh "spoke with the agents about her situation before the

10

additional boarders were selected," and "assum[ing] the agents knew" about the hardship she faced).

Six, Amarsingh lodges a general complaint that the district court did not "rigorously evaluate" Frontier's "justification for its treatment of [her]," which gives "an impression of nonchalant acceptance" of that justification. Aplt. Br. at 22. We again disagree. The district court engaged in a thorough analysis of the pertinent issue—whether Amarsingh plausibly alleged a § 1981 claim.

Seven, Amarsingh argues that the district court's "assertion that the presence of a white male passenger negates any possibility of discrimination represents a fundamentally flawed understanding of racial dynamics and discrimination." Aplt. Br. at 23. But she does not identify, and we have not found, where in the record the district court made such an assertion.

Finally, Amarsingh offers a general observation that "patterns of bias, irrespective of their targets, demand rigorous scrutiny," and "[s]ystemic discrimination . . . necessitates that courts evaluate a broader context when assessing claims of racial discrimination." *Id.* at 24. We do not disagree with those comments, but there has been no failure in that regard by the courts in this case.

In sum, we conclude that Amarsingh has not demonstrated any reversible error in the district court's dismissal of her claims. We therefore affirm the court's judgment.

### III. SANCTIONS

Our review of Amarsingh's brief revealed serious flaws, including citations to nonexistent cases and attribution of propositions or quotations to two real cases that did not stand for the propositions or contain the quotations. We suspected that these flaws resulted from Amarsingh's use of generative artificial intelligence (GenAI) in researching and drafting her brief. Accordingly, we ordered her to correctly cite and provide accurate copies of seven cases we could not locate. We also ordered that if she was unable to do so, she must thoroughly explain how the fabricated case citations and the other problems we identified ended up in her brief. We also ordered her to show cause why she should not be sanctioned.

In response, Amarsingh admitted that she had used a GenAI tool—ChatGPT—as a research and drafting aid, which generated the seven fabricated case citations, commonly referred to as "AI hallucination[s]." *See Wadsworth v. Walmart, Inc.*, 348 F.R.D. 489, 493 (D. Wyo. 2025) (explaining that an AI "hallucination occurs when an AI [model] generates fake sources of information"); *Jones v. Kankakee Cnty. Sheriff's Dep't*, ___ F.4th ___, 2026 WL 157661, at *2 (7th Cir. Jan. 21, 2026) (defining "a so-called AI 'hallucination'" as "a circumstance where an AI large language model generates an output that is fictional, inaccurate, or nonsensical"). Amarsingh also admits that she did not verify that the seven cases existed or that the two quotations actually appeared in the real cases she cited. She says that she "was able to find the actual cases that AI distorted and cited to," and apparently tries to justify her errors by adding that "it would appear there is an embedded algorithm to

12

cause open-source AI tools to intentionally 'grab' cases outside the scope of the searched term." Resp. at 5.

As for sanctions, Amarsingh states that she had no intention to "misrepresent[] the law or the record." *Id.* at 10. She "submit[s] that dismissing the appeal would be disproportionate to the harm caused and [Frontier's] own procedural deficiencies," *id.* at 9, namely Frontier's failure to serve her "with a copy of its corrected brief and . . . upload the operative brief to the Court's docket," *id.* at 13. She claims that she repeatedly contacted this court's Clerk's Office to ask about the status of Frontier's response brief, only to be "informed that the brief was pending and that she would receive notice upon its upload." *Id.* at 13–14. She asserts that Frontier's "corrected brief remains absent from the docket," and her lack of access to it "materially hindered [her] ability to respond to the arguments [Frontier] raised" or "proactively correct any misstatements in her own filings." *Id.* at 14. Amarsingh also asks us to consider that around the time of the events giving rise to this case, she "had recently been involuntarily medically discharged from the United States Army after nearly 16 years of honorable service." *Id.* at 10.[4] She claims that she is committed to preventing similar errors in the future, intends to "self-report[] as part of a case

---

[4] In the operative complaint, Amarsingh asserted she was "a United States Army JAG Attorney." R. vol. 1 at 67, ¶ 20.

study," *id.* at 12, and has already completed a continuing legal education (CLE) course on the ethics of using artificial intelligence in the law.[5]

We appreciate Amarsingh's candor regarding both her use of GenAI and her failure to verify the results. We also appreciate that she is willing to try to do better in the future and may have taken steps in that direction. But we find less than compelling much of her attempt to mitigate the seriousness of her errors, in particular her effort to blame Frontier and this court's Clerk's Office for her failure to review Frontier's corrected response brief, which would have alerted her to the fabricated case citations and some of the misattributions. Frontier's corrected brief has been available on the court's electronic docket since February 25, 2025, *see* Dkt. No. 19, well before we issued our show-cause order on September 5, 2025. Moreover, Amarsingh consented to electronic service in this case, *see* Dkt. No. 6, so (1) she received a notification by email that the corrected brief was filed and (2) she could have retrieved a copy by clicking on the hyperlink for the document. And, most importantly, we are not inclined to excuse Amarsingh's errors on the ground that others should have pointed them out more promptly.

We conclude that the circumstances here do not warrant the harsh sanction of dismissing the appeal. Nonetheless, Amarsingh's failings are quite serious and warrant a significant sanction. Although there is nothing inherently problematic with

---

[5] We note that although Amarsingh attached a certificate indicating she completed a CLE course, she did not sign the certificate or provide her bar number. *See* Resp. at 18.

14

the use of GenAI in the practice of law, careless use of the tool can waste both judicial resources and the opposing party's time and money, and it can damage the credibility of the legal system. *See Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448–49 (S.D.N.Y. 2023). As one court has aptly put it, "[T]he use of artificial intelligence must be accompanied by the application of actual intelligence in its execution." *Mid Cent. Operating Eng'rs Health & Welfare Fund v. HoosierVac LLC*, No. 2:24-CV-326, 2025 WL 574234, at *4 (S.D. Ind. Feb. 21, 2025), *report and recommendation adopted as modified*, 2025 WL 1511211 (S.D. Ind. May 28, 2025).

"This court has the inherent power to impose sanctions that are necessary to regulate its docket, promote judicial efficiency, and deter frivolous filings." *Mann*, 477 F.3d at 1150. In addition, Amarsingh's conduct on appeal is "governed by Federal Rule of Appellate Procedure 38," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 407 (1990), which provides that "[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." The term "just damages" includes "attorney's fees." *Braley v. Campbell*, 832 F.2d 1504, 1510 (10th Cir. 1987) (en banc).

We elect to proceed under Rule 38. We have already provided Amarsingh with the requisite notice and opportunity to respond. After a thorough review, we conclude that this appeal is, in part, frivolous as argued. In a "frivolous as argued" appeal, "genuinely appealable issues may exist," but "the appellant's contentions in prosecuting the appeal are frivolous." *Finch v. Hughes Aircraft Co.*, 926 F.2d 1574,

15

1579–80 (Fed. Cir. 1991) (emphasis omitted).[6] An appeal may be frivolous as argued if supporting briefs (1) contain "citations of inapplicable or irrelevant authorities" or (2) "misrepresent[] facts or law to the court." *Id.* at 1579.

Amarsingh's citation of multiple nonexistent cases and her misattribution of propositions and quotations to actual cases meet this standard. The citation of nonexistent cases is especially troublesome; "[a]n attempt to persuade a court or oppose an adversary by relying on fake opinions is an abuse of the adversary system." *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024) (internal quotation marks omitted).

The test under Rule 38 is not whether an attorney acted with subjective bad faith but whether the conduct, when "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *Braley*, 832 F.2d at 1512. Amarsingh's actions were reckless because of her complete failure to perform an attorney's fundamental duty to the court—confirming that all the cited cases exist and stand for the propositions for which they are cited, and accurately quoting from the cited authorities. *See Park*, 91 F.4th at 615 (stating, in the related context of attorney obligations in federal district courts under Federal Rule of Civil Procedure 11, that "[a]t the very least," attorneys must "read, and thereby confirm the existence and validity of, the legal authorities on which they rely").

---

[6] In contrast, an appeal is "frivolous as filed" when "the judgment by the tribunal below was so plainly correct and the legal authority contrary to appellant's position so clear that there really is no appealable issue." *Finch*, 926 F.2d at 1579–80 (emphasis omitted). This appeal is not frivolous as filed.

Courts have issued a variety of sanctions against attorneys and pro se parties for similar misconduct, including monetary sanctions, payment of the opposing party's attorney fees incurred in responding to the misconduct, striking filings containing fabricated case citations, dismissing complaints, dismissing or denying appeals, and referring attorneys to the appropriate disciplinary body. *See United States v. Hayes*, 763 F. Supp. 3d 1054, 1071–72 (E.D. Cal. 2025) (collecting cases). Considering Amarsingh's candor and remorse, and the novelty at the time of the infraction (January 24, 2025) of the use of AI by lawyers, we conclude that the following sanctions are appropriately tailored to the conduct and circumstances in this appeal:

(1) Within 30 days of the filing of this decision, Amarsingh must pay $1,000 to Frontier to offset attorney fees and costs Frontier incurred in responding to the problems Frontier and the court have identified in Amarsingh's brief. *See, e.g.*, *Benjamin v. Costco Wholesale Corp.*, 779 F. Supp. 3d 341, 351 (E.D.N.Y. 2025) (imposing $1,000 fine on attorney, which was "lower than in many other similar cases in part because of [the attorney's] candor and sincere regret," one-time use of GenAI, and voluntary CLE participation); *Jackson v. Auto-Owners Ins. Co.*, No. 7-24-cv-136, 2025 WL 1932274, at *5 (M.D. Ga. July 14, 2025) (imposing a $1,000 fine and awarding the opposing party attorney fees and costs associated with review of hallucinated cases). Amarsingh must file a sworn certification with the court that she has complied with this requirement.

17

(2) We direct the Clerk's Office to transmit a copy of this Order and Judgment detailing Amarsingh's misconduct in this case to the appropriate attorney-disciplinary authority of the State of Maryland. *See, e.g.*, *Park*, 91 F.4th at 616 (referring attorney to relevant disciplinary body); *Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1267 (N.D. Ala. 2025) ("referral to licensing authorities is a bare minimum in the light of the primary nature of a lawyer's professional responsibility not to make things up"); *cf. Hayes*, 763 F. Supp. 3d at 1073 (referring attorney to relevant state bar associations in addition to imposing a $1,500 monetary sanction).

## IV.  CONCLUSION

We affirm the district court's judgment, and we impose sanctions on Amarsingh as set forth above.  We deny Amarsingh's request to file a corrected opening brief.

Entered for the Court


Harris L Hartz
Circuit Judge