**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 25, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CONRAD TRUMAN,

     Plaintiff - Appellant,

v.

OREM CITY, a Utah municipality; OREM
CITY POLICE DEPARTMENT, a division
of Orem City; OREM CITY POLICE
OFFICER THOMAS WALLACE, an
individual; OREM CITY POLICE
OFFICER WILLIAM CROOK, an
individual; OREM CITY POLICE
OFFICER ORLANDO RUIZ, an
individual; OREM CITY POLICE
OFFICER ART LOPEZ, an individual;
OREM CITY POLICE OFFICER TODD
FERRE, an individual; UTAH COUNTY
ATTORNEY'S OFFICE, a division of
Utah County; DEPUTY UTAH COUNTY
ATTORNEY CRAIG JOHNSON, an
individual; OFFICER(S) JOHN/JANE
DOE 110, individuals; ATTORNEY(S)
JOHN/JANE DOE 1-5,

     Defendants - Appellees.

No. 19-4133
(D.C. No. 2:17-CV-00775-TS)
(D. Utah)

_____

**ORDER**
_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **CARSON**, Circuit Judges.
_____

This matter is before the court on the *Petition for Rehearing* filed by Appellee Craig Johnson.

Pursuant to Fed. R. App. P. 40, the petition for rehearing is granted in part to the extent of the modifications to footnote 11 in the attached revised opinion. The court's June 4, 2021 opinion is withdrawn and replaced by the attached revised opinion, which shall be filed as of today's date.

Because the panel's decision to partially grant rehearing resulted in only non-substantive changes to the opinion that do not affect the outcome of this appeal, Mr. Johnson may not file a second or successive petition for rehearing. *See* 10th Cir. R. 40.3

Entered for the Court
CHRISTOPHER M. WOLPERT, Clerk

by: Jane K. Castro
    Chief Deputy Clerk

FILED
United States Court of Appeals
Tenth Circuit

June 25, 2021

Christopher M. Wolpert
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CONRAD TRUMAN,

      Plaintiff - Appellant,

v.

OREM CITY, a Utah municipality;
OREM CITY POLICE DEPARTMENT, a
division of Orem City; OREM CITY
POLICE OFFICER THOMAS
WALLACE, an individual; OREM CITY
POLICE OFFICER WILLIAM CROOK,
an individual; OREM CITY POLICE
OFFICER ORLANDO RUIZ, an
individual; OREM CITY POLICE
OFFICER ART LOPEZ, an individual;
OREM CITY POLICE OFFICER TODD
FERRE, an individual; UTAH COUNTY
ATTORNEY'S OFFICE, a division of
Utah County; DEPUTY UTAH COUNTY
ATTORNEY CRAIG JOHNSON, an
individual; OFFICER(S) JOHN/JANE
DOE 110, individuals; ATTORNEY(S)
JOHN/JANE DOE 1-5,

      Defendants-Appellees.

No. 19-4133

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:17-CV-00775-TS)

Dick J. Baldwin, Zimmerman Booher (Troy L. Booher and Beth E. Kennedy, Zimmerman Booher, and Mark R. Moffat and Ann Marie Taliaferro, Brown Bradshar & Moffat, and Lincoln Hobbs, Hobbs & Olson, with him on the briefs), Salt Lake City, Utah, for Appellant.

Jefferson W. Gross (S. Ian Hiatt with him on the brief), Gross & Rooney, Salt Lake City, Utah, for Appellees Orem City, Orem City Police Department, Officers Thomas Wallace, William Crook, Orlando Ruiz, Art Lopez, and Todd Ferre.

Peter Stirba (Ciera Archuleta with him on the brief), Stirba, P.C., Salt Lake City, for Appellees Craig Johnson and Utah County Attorney's Office.

_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **CARSON**, Circuit Judges.

_____

**TYMKOVICH**, Chief Judge.

_____

Conrad Truman sued state prosecutor Craig Johnson and various Orem City police officers for violating his civil rights by fabricating evidence that was used against him in a murder prosecution. Mr. Truman was prosecuted twice for the murder of his wife. According to Mr. Truman's complaint, the prosecution knowingly falsified measurements of the murder scene to rule out the possibility of suicide or a self-inflicted accidental wound. As a result, the state medical examiner deemed Mrs. Truman's death a homicide and Mr. Truman was indicted and successfully prosecuted for murder. After his conviction, he learned of the

2

mismeasurements and the state court granted him a new trial. In the second trial where proper room measurements were admitted into evidence, Mr. Truman was acquitted.

These events led Mr. Truman to file a 42 U.S.C. § 1983 action against the prosecutor and the police. The district court found that the prosecutor was entitled to qualified immunity as a matter of law and the claims against the police officers were barred by previous holdings in state court.

Exercising jurisdiction under 28 U.S.C. § 1291, we disagree with the district court that the prosecutor is entitled to qualified immunity at this stage in the proceedings. At the motion to dismiss stage, the allegations in the amended complaint plausibly allege the elements of a fabrication of evidence claim. As a result, dismissal based on qualified immunity was inappropriate. But summary judgment was appropriate as to the police officers because Mr. Truman forfeited his argument regarding issue preclusion in state court and did not argue for plain error review on appeal.

We therefore REVERSE the dismissal of the fabrication of evidence claim against the prosecutor and AFFIRM the entry of summary judgment in favor of the police officers.

# I. Background

Heidy Truman suffered a fatal gunshot wound to the head on September 30, 2012. She lived in a small residence with her husband, Conrad Truman, and they were home alone when the shooting occurred.

At the time of the shooting, according to the amended complaint, Mrs. Truman was in the area near the bathroom and bedroom and Mr. Truman was in the kitchen. Mr. Truman alleges he heard a door open, and then a "pop." He walked towards the sound and found Mrs. Truman falling to the ground through the hallway entry to the floor of the kitchen area. Mrs. Truman owned a gun and it was located on the floor next to her. Mr. Truman tried to perform CPR on his wife and then called 911. Paramedics and police officers arrived. Mrs. Truman was transported to the hospital where she ultimately died. At the time, Mr. Truman told police that she may have shot herself or perhaps a shot came from outside the home.

After her death, based on what he knew, the medical examiner initially listed Mrs. Truman's manner of death as "could not be determined." But nearly a year later, Orem City police officers and state prosecutor Craig Johnson met with the medical examiner and showed him a PowerPoint presentation outlining their theory of the case—murder. It included a crime scene diagram depicting an approximately seven-foot distance between Mrs. Truman's feet and the hallway

4

entrance where Mr. Truman claimed the shot was fired. Another slide stated Mrs. Truman's body was found over twelve feet away from the spot where Mr. Truman said he saw her after he heard the shot. Contrary to these representations, Mrs. Truman's feet were actually three-and-one-half feet from the hallway entrance and she moved only about nine inches from the spot where Mr. Truman said he first saw her after he heard the shot. Because it is physically impossible for someone who has been shot in the head to walk more than a step or two before collapsing, the medical examiner concluded someone else had shot Mrs. Truman. He then changed her manner of death to homicide.[1]

After this meeting, Mr. Truman was charged with his wife's murder and with obstruction of justice. Mr. Truman alleges that, at trial, based on inaccurate information provided by the Orem City police officers and the prosecutor in the PowerPoint presentation, the medical examiner testified that Mrs. Truman's manner of death was homicide because she could not have moved the distance from the hallway to where her body lay if the wound were self-inflicted.[2]

---

[1] The medical examiner testified at the first trial and declared in an affidavit attached to the amended complaint that someone shot in the head with Mrs. Truman's injuries would be able to take only a step or a step and one-half before collapsing. *See* Aplt. App. 241.

[2] Again, according to the medical examiner's subsequent scene reconstruction, Mrs. Truman only traveled approximately nine inches, a distance that is possible if she shot herself as Mr. Truman maintains.

5

The prosecution also presented the jury a sketch of the layout of the house showing the location of the bathroom, kitchen, and body. On the night of the incident, Detective Thomas Wallace made a hand sketch of the house using a tape measure. When Detective Wallace later prepared a computer diagram of the scene, however, Mr. Truman alleges that Detective Wallace made a transcription error and typed 13.9 feet instead of 139 inches as the length of the hallway in the Truman home. This caused the diagram to inaccurately depict the length of the hallway as being about two feet and four inches longer than it really is. Significantly, the diagram also exaggerated the distance between the location of Mrs. Truman's body and the place where Mr. Truman claimed to have heard the shot. The measurements were used to generate a trial exhibit misrepresenting the dimensions of the rooms and the exact location of Mrs. Truman's body. The exhibit also significantly undermined the possibility of an accident or that Mrs. Truman committed suicide because the inaccurate diagram depicted Mrs. Truman's body as far more than a step or two from the shot location. After considering this evidence, the jury convicted Mr. Truman.

While imprisoned for his wife's murder, Mr. Truman and his legal team discovered the inaccuracies of the evidence used against him. They filed a motion for a new trial in state court. The medical examiner filed an affidavit in which he stated that he "concluded that the gunshot wound could not have been

6

self-inflicted . . . based upon the representation by law enforcement that Heidy Truman traveled 12-feet from the location where the shot was fired to the final resting place of her body." Aplt. App. 200. He also explained that "based upon [the] information I received from the prosecution team, in conjunction with what I observed during the autopsy, it was my opinion that . . . [t]he wound would have incapacitated Heidy Truman" and "[d]ue to the nature of the wound, Heidy would not have been able to travel far after the wound was inflicted." *Id*. The medical examiner concluded that "[b]ased on the information provided in the PowerPoint as well as the statements and explanations of members of the prosecution team, I amended my manner of death classification . . . from 'not determined' to 'homicide.'" *Id*. at 200–01. Upon consideration of the inaccurate diagram used and the flawed testimony of the medical examiner given at the first trial, the state court found that the prosecution introduced evidence such that "the incorrect dimensions presented to the jury in essence removed from its members the issue of reasonable doubt on the theory of suicide" and "had the accurate dimensions been presented to the jury[,] a different result may have resulted." *Id*. at 120, 608. A new trial was ordered.

Mr. Truman was tried a second time. This time, the medical examiner did not testify and the prosecution did not use an inaccurate drawing of the scene and body location. The second jury acquitted Mr. Truman.

7

Mr. Truman then brought this § 1983 action against the prosecutor and the police officers involved in his criminal prosecution. He alleges many claims, but relevant to his appeal are his fabrication of evidence claims against the prosecutor and the police officers.

## II. Analysis

Mr. Truman contends the district court erred by dismissing his fabrication of evidence claim against the prosecutor because it found he is entitled to qualified immunity. Mr. Truman further asserts error in the district court's grant of summary judgment to the police officers on his fabrication of evidence claim. As we explain, we agree as to the prosecutor, but not as to the police officers.

### A. Fabrication of Evidence Claim

Mr. Truman appeals the dismissal of his fabrication of evidence claim against Craig Johnson, the prosecutor in his first state criminal case. The district court found the prosecutor is entitled to qualified immunity because Mr. Truman failed to state a claim that the prosecutor violated a constitutional right.

Mr. Truman asserts that the prosecutor violated his constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer. As a result, he contends the district court erred in concluding that the prosecutor is entitled to qualified immunity.

8

### 1. *Applicable Law*

We review a dismissal under Federal Rule of Civil Procedure 12(b)(6) based on qualified immunity de novo. *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013). The Federal Rules require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, all well-pleaded allegations in the complaint must be accepted as true and viewed "in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). While a complaint need not recite "detailed factual allegations," "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted; alteration in original). The pleaded facts must establish that the claim is plausible. *Id*.

District courts may grant a motion to dismiss based on qualified immunity, but "[a]sserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). Specifically, the court analyzes "the defendant's conduct *as alleged in the*

9

*complaint.*" *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). "In the context of a § 1983 action against multiple individual governmental actors, it is particularly important . . . that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her." *Wilson*, 715 F.3d at 852 (internal quotation marks omitted).

A § 1983 defendant's assertion of qualified immunity is an "affirmative defense [that] creates a presumption that the defendant is immune from suit." *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020). To overcome this presumption, the plaintiff must show (1) the defendant's actions violated a constitutional or statutory right, and (2) that right was clearly established at the time of the defendant's complained-of conduct. *Thomas*, 765 F.3d at 1194. A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Id*. Thus, "the contours of the right must be sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Id*. But "our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Reavis v. Frost*, 967 F.3d 978, 992 (10th

10

Cir. 2020) (internal quotation marks omitted). There can also be "the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks omitted).

The constitutional right at issue in this case is Mr. Truman's due process right not to be deprived of liberty as a result of the fabrication of evidence by a government officer. To rise to the level of a constitutional violation, a plaintiff must assert a causal connection between the fabrication of evidence and the deprivation of liberty.[3] *See Warnick v. Cooley*, 895 F.3d 746, 753 (10th Cir. 2018); *see also Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000). Thus, to state a fabrication of evidence claim, a plaintiff must allege (1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the

_____

[3] The parties present the constitutional right at issue to be the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer. This has long been recognized as a constitutional right, *see Pyle v. Kansas*, 317 U.S. 213, 216 (1942), but it often overlaps with malicious prosecution claims, sometimes creating confusion about whether it is an independent constitutional claim. *See, e.g.*, *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004); *Wilkins v. DeReyes*, 528 F.3d 790, 795 (10th Cir. 2008). But a fabrication of evidence claim implicates the Constitution, notwithstanding its failure to satisfy the elements of a malicious prosecution claim. So, even if that overlap is present here, we only analyze the constitutional right as a fabrication of evidence claim. Moreover, even if we analyze this as a malicious prosecution claim, the record is insufficient to determine whether the elements of malicious prosecution are met—namely, whether there was a lack of probable cause.

11

plaintiff,[4] (3) the use of the fabricated evidence deprived the plaintiff of liberty,[5] and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt.[6] *See Warnick*, 895 F.3d at 753; *Heck v. Humphrey*, 512 U.S. 477, 478 (1994). Although "[t]here is some disagreement . . . over what degree of intent the officer must have," *Pierce*, 359 F.3d at 1293, he necessarily must possess knowledge of the evidence's falsity. *See* Evidence, Black's Law Dictionary (11th ed. 2019)

---

[4] Where the alleged fabrication of evidence was performed by a member of the executive branch, like the prosecutor here, the deprivation violates due process only when it "'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1190 (10th Cir. 2020) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)).

[5] To satisfy this element where, as here, the plaintiff was allegedly deprived of a fair trial, the fabricated evidence must be material, meaning there is a reasonable likelihood that without the use of the fabricated evidence, the defendant would not have been deprived of a fair trial. Although a plaintiff's conviction based in part on the presentation of fabricated evidence at trial is evidence that he or she was deprived of a fair trial, it is not crucial to a § 1983 fabrication of evidence claim. An acquitted plaintiff may have been deprived of liberty due to fabricated evidence if there is a reasonable likelihood that without the fabricated evidence, the plaintiff would not have been criminally charged.

[6] More specifically, the *Heck* Court explained this can be satisfied with proof "that the [defendant's] conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 486–87 (1994).

12

(defining "fabricated evidence" as "[f]alse or deceitful evidence that is unlawfully created . . . in an attempt to achieve or avoid liability or conviction").

### 2. *Discussion*

Mr. Truman's allegations are sufficient to overcome the prosecutor's claim of qualified immunity. He plausibly alleges (1) the prosecutor's actions violated his constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer and (2) the right was clearly established at the time of the prosecutor's conduct. As relevant here, Mr. Truman alleges:

- ▸ The prosecutor was present in the Truman home during a crime scene reconstruction walk-through on May 30, 2013. Aplt. App. 336–37.
- ▸ The prosecutor reviewed photographs from the crime scene reconstruction on May 30, 2013. *Id*. at 337.
- ▸ The prosecutor knew Mrs. Truman's body was located close to the hallway entrance just as Mr. Truman explained and consistent with where she would have fallen from a self-inflicted shot in that reported area. *Id*.
- ▸ Notwithstanding knowledge of the accurate location and size of Mrs. Truman's body, the prosecutor "fabricated, aided, advised, and/or directed the fabrication of evidence, testimony, diagrams and/or other depictions in order to corroborate a false 'distance traveled.'" *Id*. at 337, 352.
- ▸ Notwithstanding knowledge of the accurate location and size of Mrs. Truman's body, the prosecutor shared the fabricated distance-traveled evidence with the medical examiner in order to influence him to change the manner of Mrs. Truman's death to homicide. *Id*. at 338, 352.
- ▸ The prosecutor, among others, met with the medical examiner on July 17, 2013. *Id*. at 340.

13

▸ The prosecutor made representations to and answered questions for the medical examiner in this meeting. *Id*.

▸ At the meeting, the medical examiner was presented with a diagram of the crime scene with inaccurate dimensions. *Id*. at 341.

▸ The prosecutor knew the diagram was inaccurate but still presented it to, or allowed it to be presented to, the medical examiner. *Id*. at 342.

▸ The fabricated diagram was a fundamental basis for the medical examiner's change in his manner of death determination from undetermined to homicide. *Id*.

▸ During Mr. Truman's first trial, state prosecutors presented the medical examiner as an expert witness and "knowingly presented his tainted opinion that this death was a homicide." *Id*. at 345.

▸ The fabricated distance-traveled evidence was presented to the jury in the first trial and served as one of the foundational bases for Mr. Truman's conviction. *Id*. at 339.

▸ The prosecutor presented a PowerPoint presentation to the medical examiner with false information, specifically that Mrs. Truman traveled over twelve feet after she was shot. *Id*. at 353.

▸ The prosecutor knew the diagram in the PowerPoint presentation was false because he had been to the Truman residence multiple times, attended a crime scene reconstruction walk-through, and had seen a more accurate diagram created by Jason Keller (Mrs. Truman's brother-in-law). *Id*. at 354.

▸ After Mr. Truman's new counsel presented the medical examiner with accurate information and after the medical examiner viewed the scene in person, he corrected his manner of death opinion from the first trial and concluded he could not rule out that Mrs. Truman's death was a suicide. *Id*.

14

Mr. Truman also attached the declaration of the medical examiner to the amended

complaint,[7] which includes the following assertions:

> ▸ The prosecutor attended a meeting regarding Mrs. Truman's death with the medical examiner, among others, on July 17, 2013. *Id*. at 238–39.
>
> ▸ Detective Wallace presented a PowerPoint presentation of Orem City's theory of the case. *Id*. at 239.
>
> ▸ The PowerPoint presentation indicated Mrs. Truman's body traveled more than twelve feet from the location where she was shot to the location where her body was found. *Id*.
>
> ▸ The medical examiner relied on a PowerPoint slide to conclude Mrs. Truman's gunshot wound could not have been self-inflicted because she could not have traveled over twelve feet after being shot in the head. *Id*. at 241.
>
> ▸ The measurements in a PowerPoint slide presented to the medical examiner and those in an exhibit presented to the jury at trial are both incorrect and make the dimensions in the Truman home appear larger than they are. *Id*. at 245.

### a. Violation of a Constitutional Right

Accepting these allegations as plausibly true and viewing them in the light

most favorable to Mr. Truman, they establish the elements of a fabrication of

evidence claim.

First, they plausibly allege the prosecutor fabricated evidence. Mr. Truman

repeatedly asserts the prosecutor knew the PowerPoint slide of the crime scene

---

[7] Courts can consider not only the complaint but also attached exhibits and documents incorporated into the complaint by reference. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

diagram presented to the medical examiner was inaccurate, yet it was still presented to the medical examiner. He supports this with specific facts, like the prosecutor's multiple visits to the Truman home, his attendance at a crime scene reconstruction, and his viewing of photos from the crime scene reconstruction. These facts of course do not necessarily mean the prosecutor had knowledge that the dimensions in the PowerPoint slide were inaccurate. But the motion to dismiss standard requires the panel to draw the inference that these facts indicate knowledge, an inference favorable to Mr. Truman. It may be that after discovery these issues will be clarified.

Mr. Truman also supports his claim by specifically asserting the prosecutor made materially false statements to the medical examiner and presented the PowerPoint presentation to him with false information that Mrs. Truman traveled over twelve feet after she was shot. The district court focused on the fact that the medical examiner's declaration attached to the amended complaint does not attribute any specific statement to the prosecutor—but to require such specificity is unreasonable considering no discovery has occurred at this stage of litigation. The inferences in favor of Mr. Truman drawn from the specific allegations in the amended complaint and the medical examiner's declaration lead to the conclusions that the prosecutor knew the PowerPoint presentation was inaccurate, presented it to the medical examiner regardless, and put the medical examiner on

16

the stand in the first trial with knowledge that his opinion was based on fabricated evidence. Mr. Truman sufficiently alleges the prosecutor fabricated evidence.

Second, the fabricated evidence was used in the criminal case against Mr. Truman. Mr. Truman alleges, and the medical examiner declares, the fabricated evidence formed a foundation for the medical examiner's opinion that Mrs. Truman's manner of death was homicide. The prosecutor used the medical examiner as an expert witness at Mr. Truman's first trial, and the medical examiner's testimony was based on the fabricated evidence.

Third, the use of the fabricated evidence deprived Mr. Truman of a fair trial. Mr. Truman was convicted in his first trial that included the medical examiner's flawed expert testimony but acquitted in his second trial that did not include the medical examiner's flawed expert testimony. This shows that the allegedly fabricated evidence was material, as there was *more than* a reasonable likelihood that without the use of the fabricated evidence, the defendant would not have been deprived of a fair trial.

Fourth, Mr. Truman's conviction has been invalidated. The state court vacated his conviction from the first trial, and then he was acquitted in the second trial.

Mr. Truman's allegations paint a picture of arbitrary executive action that shocks the conscience: the prosecutor intentionally presented false information to

17

the medical examiner to get him to change Mrs. Truman's manner of death to homicide and then put the medical examiner on the stand to testify based on that false information in order to secure Mr. Truman's conviction. Accordingly, Mr. Truman sufficiently alleges the prosecutor's actions violated his constitutional due process right not to be deprived of liberty as a result of the fabrication of evidence by a government officer, satisfying the first requirement to overcome the presumption of qualified immunity.

### b. Clearly Established Constitutional Right

We also conclude the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct.

The constitutional violation at issue here was clearly established by our decision in *Pierce* in 2004. In *Pierce*, a plaintiff wrongly convicted of rape sued a police department forensic chemist under 42 U.S.C. § 1983 for the constitutional tort of malicious prosecution. 359 F.3d at 1283–84. The complaint there alleged that the forensic chemist performed a forensic analysis on hair samples from the crime scene and concluded many were "microscopically consistent" with the plaintiff. *Id*. at 1282. It further alleged the forensic chemist's findings were knowingly false, without a scientific basis, and led to the plaintiff's wrongful conviction. This court held the forensic chemist was not

18

entitled to qualified immunity. Citing Supreme Court precedent, we explained it was clearly established that a criminal defendant's due process rights are implicated when the state knowingly uses false testimony to obtain a conviction. *Id*. at 1299 (citing *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)); *see also Mooney v. Holohan*, 294 U.S. 103, 112 (1935) ("[P]resentation of testimony known to be perjured . . . to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation."). The *Pierce* court continued that a government officer's knowing or reckless fabrication of evidence is not objectively reasonable.

The alleged facts in this case are obviously not identical to those in *Pierce*: prosecutor versus forensic analyst, incorrect dimension evidence versus faulty hair sample evidence. Even so, there are consistent factual strands running through these cases that put the prosecutor on notice that his alleged conduct violated Mr. Truman's constitutional rights. Just like in *Pierce*, Mr. Truman alleges that the prosecutor knowingly used false evidence to convict Mr. Truman and to deprive him of due process. Such consistency is enough to defeat qualified immunity.

The same constitutional right at issue in *Pierce* is at issue in this case. Accordingly, the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established by *Pierce* at the time of

the prosecutor's actions in 2013, satisfying the second requirement to overcome the presumption of qualified immunity.

This is also an "obvious case" of a constitutional violation. *See Wesby*, 138 S. Ct. at 590; *Pierce*, 359 F.3d at 1298. Any reasonable prosecutor understands that providing a medical examiner materially false information that influences his expert opinion as to whether a homicide occurred and then putting that medical examiner on the stand to testify based on that false information prevents a fair trial. *See Mooney*, 294 U.S. at 112. Such conduct is "obviously egregious," *Pierce*, 359 F.3d at 1298, and so the "unlawfulness of the officer's conduct is sufficiently clear even [if] existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590; *Whitlock v. Brueggemann*, 682 F.3d 567, 585 (7th Cir. 2012) ("[T]he idea that an investigating prosecutor . . . should know not to fabricate evidence in order to frame a suspect is . . . elementary[.]").

A recent Supreme Court case, *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (per curium), is instructive. In *Taylor*, an inmate brought a § 1983 claim alleging prison officials violated his Eighth Amendment rights by subjecting him to inhumane conditions of confinement. *Id*. at 53. For six days he was confined to "shockingly unsanitary cells," one covered in feces, and the other "frigidly cold." *Id*. He went four days without eating or drinking because he was fearful anything he consumed would be contaminated. *Id*. He also held his bladder for over a day

20

because the cold cell had only a clogged drain to dispose of waste. *Id.* He eventually succumbed to his urges and involuntarily relieved himself, causing the drain to overflow with raw sewage, which he was forced to sleep in naked. *Id.* The Fifth Circuit held that even though this constituted a violation of the inmate's Eighth Amendment rights, the prison officials were entitled to qualified immunity because it was not clearly established that "prisoners couldn't be housed in cells teeming with human waste for only six days." *Id.* (internal quotation marks omitted).

The Supreme Court rejected the Fifth Circuit's finding of qualified immunity. The inmate in *Taylor* could not identify a case in which a court held that an inmate confined to extremely unsanitary cells for six days offends the Constitution. But the Supreme Court made clear that he did not have to. It explained that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time." *Id.* In support, the Court reasserted its holding in *Hope v. Peltzer*, 536 U.S. 730, 741 (2002), for the proposition that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.* at 53–54.

21

This proposition applies with equal force here. The right not to be deprived of liberty as a result of the fabrication of evidence by a government officer is a general constitutional rule identified in decisional law prior to the prosecutor's conduct. *See, e.g.*, *Mooney*, 294 U.S. at 112; *Whitlock*, 682 F.3d at 585 ("[T]he deliberate manufacture of false evidence contravenes the Due Process Clause."); *id*. at 585–86 (collecting cases); *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) ("[T]he wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious . . . [so] that the right to be free from such charges is a constitutional right."). And it applied with obvious clarity to the specific conduct in question— the prosecutor's alleged fabrication of evidence and use of it against Mr. Truman, resulting in his conviction. *See Whitlock*, 682 F.3d at 585–86 (denying qualified immunity to prosecutor who allegedly fabricated evidence by encouraging and bribing witnesses to lie and then using that perjured testimony at trial to secure a conviction because the unconstitutionality of such acts was clearly established). Just like any reasonable correctional officer should understand the inmate in *Taylor*'s conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution.

22

As a result, Mr. Truman plausibly alleges a fabrication of evidence claim against the prosecutor.[8]

---

[8] The prosecutor asserts he is entitled to qualified immunity because he reasonably relied on information given to him by Orem City police officers and there was no reason for him to question the trustworthiness of this information. This argument fails, however, because it is premised on the assumption that the prosecutor lacked personal knowledge of the inaccurate evidence. This is contrary to the allegations in the amended complaint that the prosecutor visited the crime scene, which must be accepted as true at this stage.

We also note that although a prosecutor enjoys "absolute immunity from suit for activities that are intimately associated with the judicial phase of the criminal process," *see Bledsoe v. Vanderbilt*, 934 F.3d 1112, 1117 (10th Cir. 2019) (internal quotations omitted), this immunity does not extend to "fabricating evidence during the preliminary investigation of a crime," as is alleged here. *Buckley v. Fitzsimmons* (*Buckley I*), 509 U.S. 259, 261, 272–76 (1993); *see also Bledsoe*, 934 F.3d at 1118. And this rule does not change even if a prosecutor uses the evidence he or she fabricated during the preliminary investigation of a crime at trial. *See Bledsoe*, 934 F.3d at 1118 ("[The prosecutor's] potential entitlement to absolute immunity is not tethered to his use of the fabricated evidence at trial."); *id.* at 1120. The Supreme Court has explained:

> A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, . . . the immunity that protects them is also the same.

*Buckley I*, 509 U.S. at 276. Thus, just as a detective who fabricates evidence during the preliminary investigation of a crime is protected only by qualified immunity, so too is a prosecutor who fabricates evidence during the preliminary investigation of a crime. *See Bledsoe*, 934 F.3d at 1118–19.

23

### B. *Claims Against the Police Officers*[9]

Although the district court granted summary judgment to the police officers on Mr. Truman's fabrication of evidence claim against them on three separate grounds, we need only review the issue preclusion ground to affirm the district court.[10] The district court found the fabrication of evidence claim was barred because the state court previously determined the allegedly fabricated evidence was not intentionally inaccurate.[11]

We need not reach the merits of this argument because Mr. Truman forfeited it by failing to argue in the district court that issue preclusion does not bar his claim because the state court proceedings did not result in a judgment on the merits.

---

[9] Although the allegations against the prosecutor are limited to his fabrication of evidence, those against the police officers include, among other allegations, the Utah County Attorney's Office's failure to train, its insufficient customs that allowed the prosecutor and unnamed attorneys to deprive Mr. Truman of his constitutional rights, and its knowledge of constitutional violations without any remedy.

[10] The three separate grounds include (1) issue preclusion barred the claim, (2) there was not a lack of probable cause, an essential element for a malicious prosecution claim, and (3) no reasonable jury could find for Mr. Truman based on the evidence.

[11] This finding may have a preclusive effect on the fabrication of evidence claim against the prosecutor. But that issue was not presented in the prosecutor's appellate briefing, and since we do not even reach the merits of it as to the police officers, we decline to do so as to the prosecutor.

### *1. Applicable Law*

A plaintiff may be precluded from bringing a § 1983 claim by a state criminal judgment if "the state court . . . has given the parties a full and fair opportunity to litigate federal claims." *Allen v. McCurry*, 449 U.S. 90, 104 (1980). State preclusion rules govern the preclusive effect of a state judgment in federal court. *See Valley View Angus Ranch, Inc. v. Duke Energy Field Servs., Inc.*, 497 F.3d 1096, 1100 (10th Cir. 2007).[12]

Under Utah law, issue preclusion "prevents parties or their privies from relitigating facts and issues in the second suit that were fully litigated in the first suit." *Oman v. Davis Sch. Dist.*, 194 P.3d 956, 965 (Utah 2008) (internal quotation marks omitted). The elements of issue preclusion include:

> [1] the party against whom issue preclusion is asserted must have been a party to or in privity with a party to the prior adjudication;
>
> [2] the issue decided in the prior adjudication must be identical to the one presented in the instant action;
>
> [3] the issue in the first action must have been completely, fully, and fairly litigated; and
>
> [4] the first suit must have resulted in a final judgment on the merits.

*Id.*

---

[12] The parties agree that Utah state preclusion rules govern here. *See* Br. of Aplt. at 42; Br. of Orem Aples. at 28–29.

Despite some overlap, elements three and four are distinct. An issue is completely, fully, and fairly litigated when "it is properly raised . . . and is submitted for determination, and is determined." *State v. Sommerville*, 297 P.3d 665, 675 (Utah App. 2013) (internal quotation marks omitted). A final judgment is "on the merits" when "judgment is rendered only after a court has evaluated the relevant evidence and the parties' substantive arguments." *In re D.A.*, 222 P.3d 1172, 1179 (Utah 2009) (internal quotation omitted). It is thus a matter of substance over form—"real or substantial grounds of action or defense as distinguished from matters of practice, procedure, jurisdiction or form." *Sommerville*, 297 P.3d at 674. A judgment on the merits can be made at any point in litigation as long as it is "based upon a proper application of the relevant law to the facts of the case." *Miller v. USAA Cas. Ins. Co.*, 44 P.3d 663, 674 n.6 (Utah 2002).

If an appellant fails to raise an argument before the district court it is generally forfeited on appeal absent extraordinary circumstances. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below."). Filings below are "given a liberal reading," but the appellate court will "not address bald-faced new issues, theories that were discussed in a vague or ambiguous way, or issues that were raised and then abandoned pre-trial." *In re Rumsey Land Co., LLC*, 944

26

F.3d 1259, 1271 (10th Cir. 2019) (internal quotation marks omitted; alterations incorporated). Moreover, fleeting and underdeveloped references to an argument are also not preserved for appeal. *Id*.

"[A]n appellant must argue plain error" in order "[t]o urge reversal of an issue that was forfeited in district court." *Id*.[13] "If an appellant does not explain how [his] forfeited arguments survive the plain error standard, [he] effectively waives those arguments on appeal." *Id*.

### 2. Discussion

The district court held summary judgment was appropriate on Mr. Truman's fabrication of evidence claim against the police officers because it is barred by issue preclusion. The district court addressed many points raised by Mr. Truman, but as relevant here, it noted state court findings that the incorrect measurements used throughout the case were due to the police officers' ineptitude and carelessness. It further noted that the medical examiner's testimony was not intentionally falsified. Mr. Truman focuses on the state court's decision on his motion to dismiss based upon outrageous misconduct that explains that the state

---

[13] The party seeking relief under the plain error standard must show "(1) error (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Stender v. Archstone-Smith Operating Tr.*, 958 F.3d 938, 948 (10th Cir. 2020) (internal quotation marks omitted).

court's findings will not have a preclusive effect on other civil remedies. He asserts this statement shows the state court's intent for this and its previous decisions not to have a preclusive effect on subsequent civil litigation and thus they are not "on the merits."

The police officers contend this argument was not preserved. In their view, Mr. Truman only preserved for appeal a challenge to the district court's disposition of the third element of issue preclusion, whether the issue in the first action was completely, fully, and fairly litigated. The district court agreed with this assessment, *see* Aplt. App. 3107, and in fact Mr. Truman's brief in opposition to summary judgment only cited the third element and discussed the specific issue of probable cause at any length. *Id*. at 1407–09.[14]

---

[14] The exact language from Mr. Truman's relevant lower court briefing is as follows:

> First, Truman's claims were never competently, fully, and fairly litigated during the criminal proceedings as required. *See Carpenter v. Nova Casualty Co.*, 403 F. Supp.2d 1068, 1071 (D. Utah 2005). It is true that Truman filed a number of motions. The state court refused an evidentiary hearing and argument, and relied on the previous testimony which Truman claimed to be faulty. In most cases, the court denied the motion either claiming it was an issue for the jury or denied the motion without prejudice in order for Truman to have the opportunity to pose further questions at the then-upcoming trial. *See* Plaintiff's Collective Response to Def. Statements of Fact 40[–]44, *supra*.

Aplt. App. 1407–08. And:

(continued...)

28

Mr. Truman disagrees, but his argument is unpersuasive. He says he makes the same argument and cites the same facts and court language on appeal as he did below, but he essentially contends elements three and four are the same. Indeed, Mr. Truman asserts a different but related argument on appeal—whether the first suit resulted in a final judgment on the merits—that is improper. We explained this concept thoroughly in *Okland Oil Co. v. Conoco Inc.*:

> We have consistently rejected the argument that raising a related theory below is sufficient to preserve an issue for appeal. Changing to a new theory on appeal that falls under the same general category as an argument presented at trial or discussing a theory only in a vague and ambiguous way below is not adequate to preserve issues for appeal. Indeed, the Court of Appeals is not a second shot forum where secondary, back-up theories may be mounted for the first time.

144 F.3d 1308, 1314 n.4 (10th Cir. 1998) (internal quotation marks and citations omitted).

---

[14](...continued)
[T]he court denied several of the motions without prejudice, allowing Truman to further question officers at retrial, and often concluded the jury could assess the facts of the officers' intent and determine whether the evidence was faulty or false. . . . [I]n denying Truman's Motion to Dismiss Based upon Outrageous Misconduct, the court noted: "If defendant is exonerated, he will have administrative and civil remedies rather than a remedy dismissal of this matter."

*Id*. at 1375.

Even giving Mr. Truman's lower court arguments a liberal reading, his argument regarding the fourth element is fleeting and underdeveloped, which is insufficient to preserve an issue for appeal. *See In re Rumsey*, 944 F.3d at 1271. The same can also be said for the third element, as he barely touches on it below. *See supra* n.14. Mr. Truman thus forfeited his issue preclusion argument, and because he waived any argument regarding plain error review by failing to assert it on appeal, we affirm the entry of summary judgment against the police officers.

## III. Conclusion

We REVERSE the dismissal of the claim against the prosecutor and AFFIRM the district court's grant of summary judgment to the police officers.